Mr. Hannon. Mr. Chief Justice, and may it please the Court, the one-person, one-vote principle of the Equal Protection Clause requires an apportionment authority to make a good faith effort to equally apportion the population as practically as possible. And while deviations are tolerated, they are only minor deviations made for legitimate purposes of a rational State policy intended not to be discriminatory or arbitrary. Here, the Arizona Redistricting Commission malapportioned Arizona's State legislature by almost 10 percent, 8.8 percent, and the district court below found it did so for two reasons. The first reason was to obtain a partisan advantage for the Democrat Party. The second reason was a perceived belief that malapportioned districts were necessary to obtain Justice Department preclearance approval. Neither of these reasons justifies a deviation from the constitutional principle of one-person, one-vote. Sotomayor, do you want us to overturn the factual finding that compliance with the Voting Rights Act, the preclearance procedures, was the reason, real reason for the deviation? Do you want us to overturn that as a factual finding? No, I don't, as a factual finding. But when you say, Justice Kennedy, the preclearance obtaining Voting Rights Act compliance, we have said, as we've noted in the briefing, it was not necessary to underpopulate districts to obtain compliance with the Voting Rights Act. May I ask you a question? It's odd that you're making this charge that there was an impermissible effort to increase the Democratic authority power in the legislature, but the end result was that the Arizona plan gave Republicans more than their proportionate share of seats in the State legislature. And I think the numbers are, in total, Republicans won 56.6 percent of the State Senate seats, 60 percent of the State House seats, and that exceeded the Republican Party's statewide registration share of 54.4 percent. If there was an attempt to stack this in favor of Democrats, it certainly failed. Well, we would say, Your Honor, that an incompetent gerrymander is no less a gerrymander when it unequally apportions the population than a competent gerrymander that obtained the partisan objective. I think the objective that we are trying to achieve here is the one-person, one-vote standard. And that's why, whatever the ultimate political outcome, I don't think that vindicates the fact that these are unequally apportioned. Kennedy, it's still not clear to me what you want us to say about the commission's rationale for compliance and voting rights that comply. That was wrong as a matter of law? Because if you don't overturn the factual finding that they had a good-faith belief that what they were doing is correct, then you have a problem, it seems to me. Or do you have a problem? I don't believe I do, because I think it's not the good-faith belief, what the district court found was that their advisor told them, you can depopulate districts up to 10 percent, and, in fact, you should do that because you need to create these underpopulated minority districts to obtain preclearance. That is wrong. The Voting Rights Act does not command, does not compel or require underpopulated districts to obtain preclearance. The solicitor generals noted that as well in their briefing and the Justice Department guidelines. So that's wrong. Roberts, how confident are you of that? I mean, the preclearance process at the Department of Justice is famously opaque. And usually the States and municipalities have to go through or had to go through several layers of back and forth. Here's a proposal. It's sort of a bargaining process. I don't know how confident you can be that it wasn't necessary. We certainly agree that the preclearance process was very opaque, as you said, Mr. Chief Justice. I mean, we said it was like reading chicken entrails because no one really knows what you do or don't need to do to obtain preclearance. But just fundamentally, the Voting Rights Act, even prior to Shelby County, could not compel a redistricting authority to underpopulate districts. So the advice they had been given, you must underpopulate these 10 districts in order to obtain preclearance, was flawed as a matter of legal advice that doesn't justify malapportionment. So they could have achieved, as in fact their own expert, Dr. King, said, in the first map they had two maps. They had a draft map and a final map. The draft map had a 4 percent, roughly, deviation. And their own expert said this map satisfies the Voting Rights Act. Then they went and depopulated further to get a 8.8 percent deviation, so they were mistaken. I mean, you say they could have done it without disproportioning, but they thought that that was okay. They thought that they were doing this in order to comply with the Justice Department. What's the test? Is the test what they intended, or is it an objective test? Well, I think you have to look at actually both. I think you look at the objective test, is does the Voting Rights Act require you to depopulate districts? That's bad legal advice. Scalia. Let's assume the answer to that is no. Right. But the people who made this apportionment were mistaken, and they thought that it allowed and indeed may require you to do that. So that doesn't show a bad motive on their part, does it? No, but I don't think this Court's ever held that bad legal advice justifies a constitutional violation, which, in this case, that's what they're saying is the test. Well, bad legal advice is different from an impermissible motive. Well, we have a mixed motive. Justice Scalia is asking what is the test here. Well, I would say this case, as the district court noted, and all three judges split on what the burden of proof was, is a mixed motive case, where you have one assumed illegitimate motive, partisan advantage, and you have another motive, which is, oh, it's okay because we needed to do this because our advisor said that was necessary for preclearance. Then I think it the task falls to the commission to justify under this Court's decisions in Mount Healthy and Arlington Heights standard of a mixed motive case to justify, oh, this was necessary, in fact, to comply with that. And that was not a good one. But it was more than mixed motive. It was a finding of dominance. But the dominant purpose of this was to attempt to meet Section 5. Two of the judges, Judge Clifton and Judge Silver, did find that that was the predominant motive or primary motive. And that's a fact-finding, which you have a burden if you're seeking to overturn it. But they also found that there was another illegitimate motive that they assumed Judge Silver didn't necessarily agree, but she assumed for purposes of decision that this partisan advantage was a illegitimate motive. So you have a case where this body is unconstitutionally departing from one person one vote. They come forward with two explanations, one illegitimate, one supposedly legitimate, this preclearance based on erroneous legal advice. And on the basis of that, the Court split on what the burden of proof was. We would do this. Kagan, let me just down a little bit. Mr. Hearn, you, you are not contesting the factual finding that the predominant motive was to comply with the Voting Rights Act. Is that right? Hearn, we take the factual findings from the district court. We don't protest those. But what we do believe is that the court applied the wrong burden-shifting standard in that, in their analysis of those facts. When they have a mixed motive, the proper response would have been to say, okay, you've shown we found one illegitimate motive. Kagan, you keep on saying mixed motive, and I guess people keep on coming back to you and just trying to figure out whether you are in fact or are not in fact contesting that the predominant motive was the Voting Rights Act. The – when we say the Voting Rights Act, again, I want to make my position clear. Was the attempt to comply with the Voting Rights Act. Correct. And the court found, and it is a factual finding, that that's the predominant motive. And I don't mean to harangue you on this. I just want to understand what your argument is. No. We, to be very clear, yes, we accept the factual finding of the two judges that that was what they said was the primary motive. But they erred when they did not shift the burden in a mixed motive case under Arlington Heights, I think footnote 21, or Mount Healthy kind of standard. Secondly, they erred when they gave a justification and found it legitimate when there really was not a legal need to do what they did. There was no need – you know, the Voting Rights Act can't compel vote dilution. And that justification, even if it was had in good faith, does not excuse a constitutional violation of one person, one vote. So at minimum, it would need to be remanded for an opportunity for them to somehow the commission explain why they can justify these population deviations. And that's – that is our position, Justice Kagan. Sotomayor, I'm even further confused. I understand that you gave up any racial or political gerrymandering case. This is just a vote dilution case. That's absolutely correct, Justice Sotomayor. Now, I understand there's one case you're relying on that was summarily affirmed. But is there any other case from this Court that has ever said that a deviation of this amount is significant? I think we've always called it anything below 9 percent de minimis. Correct? What the Court has said, as I read the jurisprudence, is that a deviation of over 10 percent is prima facie constitutional and the State must justify it. If it's a deviation of less than 10 percent, the obligation is on the party challenging it to come forward and present some evidence showing that it is done for an arbitrary or discriminatory purpose. That's what we understand that standard to be, out of Brown v. Thompson. And, again, that was a plurality opinion. But under that standard you can't do that. Sotomayor, I don't actually understand. I don't know of any case where we've required an explanation under 10 percent. Well, I think I have two responses to that, Justice Sotomayor. First, in Cox v. Loreo, certainly this Court had a summary affirmance, and the concurring opinion in that case by Justice Stevens and Breyer does say that there is not this magic bright line. And then other decisions of this Court have always disavowed creating some simple bright line test where deviations from the constitutional standard below that are tolerated. So, for example, in Karcher, that decision said we specifically don't want to set some line, because the minute we do that, legislators or redistricting authorities will immediately use that as the new standard. Sotomayor, Well, in fact, they have. They've pretty much used 10 percent, and we've not discouraged them from doing that. It has certainly appeared in some of the district court decisions that they have looked at that. And, again, we see that as a burden-shifting rule. Breyer, what it says in Brown v. Thompson, it says, Our decisions have established, as a general matter, that an apportionate plan with a maximum population deviation under 10 percent falls within this category of minor deviations. And what we held previously was that minor deviations from mathematical equality among State legislatures are insufficient to make out a prima facie case of invidious discrimination. So that's the holding of the Court. And this seems to be within the category of minor deviations, where you have to make out you have to do something more than you would have to do if it were a larger than 10 percent. Now, what do you think you have to do? Well, I think we have to do, Justice Breyer, what we did, which is to come to the Court, to come to a district court, and to present to them evidence which the district court found of you have a deviation that, though minor, is done for an illegitimate purpose. And, yes, there was this other pretext of the preclearance issue. That satisfied the burden of requiring judicial scrutiny of that redistricting. And so we have satisfied that burden because of how they're having a minor. Don't you think this will lead every single plan to be challenged as voter dilution? Well, no. I think that you would have to still have a showing of an illegitimate purpose behind the deviation. This is you didn't just establish it by the fact of the deviation. What kind of evidence did you present to the district court? Well, I think in this case, this case is a very unique case because, as Judge Wake found in his dissent, the chart shows statistically that there was systematic partisan malapportionment done for that partisan reason. Just looking at the number. Kennedy, is that the chart at 112A of the appendix? Yes. I think that if it is the chart that is in color, I think we've also provided the color chart. Yes. And it shows that the districts were systematically, statistically malapportioned for that purpose. So that would be the kind of showing, Justice Scalia, that would be. But I thought, Mr. Hearn, that you were saying that the thing that you had presented had to do with an impermissible motive, and the impermissible motive was that they didn't have to do all this for Voting Rights Act compliance. Is that right? I say there's two. The first impermissible motive or illegitimate justification is partisanship, to gain an advantage for the district court. Right. But that's the very thing that you said you weren't challenging the factual finding, that that was a subsidiary part of the redistricting. Well, there was a dominant part was the voting rights compliance. And I take it you want to undermine the voting rights compliance rationale. But then I'm stuck on the same question that Justice Scalia is stuck on, is what evidence did you present that there was an impermissible motive with respect to that, as opposed to different views as to what the Voting Rights Act compelled? Two quick answers to that, Justice Kagan. First is, legally, the voting rights act couldn't compel them to do what they did. So that justification legally is invalid. Secondly, we bring up that point about the burden shift with Arlington Heights and Mount Healthy, where when we've shown an illegitimate motive, partisanship, then the burden task falls to the commission to justify that. And I would reserve the balance of my time. Thank you, counsel. General Bernovich. Thank you, Mr. Chief Justice. May it please the Court. Fortunately or unfortunately in this case, there are many facts that are not in dispute. Addressing Justice Kennedy's questions, the State does not dispute that the Independent Redistricting Commission did indeed draw districts of unequal population. All sides agree that these deviations were not random or that they were not incidental. We also know that in the record shows, and no one disagrees, that this pattern to underpopulate minority districts was done to help create or further ability to elect districts. And we also know that the direct evidence is they did it intentionally. So why are we here today? In the background versus Reynolds v. Sims, this court has always held that equal protection is not a criteria or another factor when it comes to redistricting, but it is essentially the background in which all redistricting elections take place. The State of Arizona and the Secretary do not dispute that compliance with Voting Rights Act was a legitimate or is a legitimate state interest. And we don't dispute that maybe there was a good motive on the part of drawing these districts. The problem is those motives don't matter when what you have is undermining of the fundamental principle of one person, one vote. So in this case, what we have is a violation of the Equal Protection Clause, because by intentionally and systematically underpopulating those minority ability to elect districts, the IRC violated Equal Protection Clause and that principle of one person, one vote. So essentially what happened was by overpopulating the other districts, the voters in the overpopulated districts had their votes diluted. And by diluting those votes, it violated the Constitution. Kennedy, it sounds fundamental that a statute can't authorize a constitutional violation so that even an attempt to comply with the Voting Rights Act is not sufficient if it violates the Equal Protection Clause. Have we ever said that, I mean, it's obvious, but have we ever said that in the context of what the Voting Rights Act requires? Mann, Your Honor, this Court has consistently, from Reynolds v. Sims, has always held that the concept and the principle of one person, one vote, any attempts to undermine that outside of the United States. Kennedy, so we have said that even, you read our case as saying even minor deviations are not permitted if they are statutorily required? Mann, Your Honor, no statute can trump the Constitution. And so the Voting Rights Act, whichever way it's read, can't be read in a way that would violate the one person, one vote. Kennedy, and that's what Judge Wake said in his dissent. Mann, And that's exactly what Judge Wake said in his dissent. And that is the State's position, is that we don't dispute or we're not saying that complying with the Voting Rights Act may indeed be a legitimate State interest. What we are saying is, is that when it's done in a systematic way where you have a one-way ratchet, where you have consistently minority ability to elect districts, essentially using folks based on racial or ethnic classifications, and underpopulating those districts, and then overpopulating other districts, what you have done is essentially undervalued or violated the one person, one vote. Alito, would you say it's correct that compliance with the Voting Rights Act, the desire to obtain preclearance, is at least like other traditional districting considerations, like respecting county lines, respecting municipal lines, having contiguous districts? Would you agree with that? Mann, Yes, Justice Alito. Alito, so if that is the case, then is this what you are asking us to say with respect to the Voting Rights Act, that the things that were really necessary to obtain preclearance are legitimate, but you can't go but they went further. They went beyond what was really necessary to obtain preclearance. So we would have to determine whether that was true or not, or some court would have to determine whether that was true or not. Mann, In this instance, because of the systematic way the deviations, the underpopulation occurred, as well as the intention, we know from the Independent Redistricting Commission that they intentionally underpopulated those districts. So we have all that evidence. However, we do believe that the Voting Rights Act is like any other criteria. So if you get these population deviations and they are incidental, not intentional, and that is the key, I believe, is when you intentionally underpopulate and systematically underpopulate these districts, that's what causes the constitutional harm. Alito, well, what if the only way that you that a State could obtain preclearance when Section 5 was still in force was to underpopulate some districts? Would that be permissible? Just as you might have a situation where the only way in which you could respect municipal lines or county lines was to underpopulate some districts to some degree. Mann, Justice Alito, the irony is in the draft maps, 7 of the 10 minority ability to elect districts were underpopulated. However, when the Independent Redistricting Commission went from the draft maps to the final maps, there was a one-way ratchet. They intentionally and systematically underpopulated those districts. Kennedy, Justice Alito can protect his own question, but he's asking you whether or not a deviation is permissible for protecting communities' interests, protecting municipal lines, whether some slight deviation is permissible. Yes. Yes, Justice Kennedy. If it's incidental and not intentional. If I'm not sure what that means. I mean, suppose. I had thought you were saying that it doesn't matter whether you were doing it to obtain Justice Department clearance. You cannot do something that is unconstitutional. That is. If in fact you don't have equally apportioned districts, it goes beyond what is tolerable, it's a violation, regardless of whether you're actually trying to comply with the jurisdiction of Justice Department. Isn't that what you were saying? Yes, Justice Scalia, but I think that it's important to note that we look at this as a qualitative, not a quantitative analysis. So there isn't like some magic number where you say at this point this becomes unconstitutional or it doesn't. The State's position is, is that compliance with the Voting Rights Act was like other neutral or traditional criteria, like protecting, as Justice Alito alluded to, communities of interest, geographical boundaries. And so in that, in considering that, you may have incidences where you get somebody, some districts above or below the line. So the fact that a district may be below the line in and of itself is not a constitutional violation. The harm occurs when the Independent Redistricting Commission systematically underpopulates those districts, those ability-to-elect districts, and overpopulates other districts, thereby diluting the votes of those people. Kagan, I guess I'm just not really sure. Let's say that there's a policy that says we want to respect county lines. And we also know that we want to do one-person, one-vote, but we think we have basically some leeway up to 10 percent. And there's a policy, we want to respect county lines, even though that's going to cause a little bit more deviation on the one-person, one-vote metric. Are you saying that that's impermissible? Kagan, we are saying that it's a policy. I mean, it's an intentional policy. I guess, you know, the road to hell is paved with good intentions. And so our position is, regardless of their intention, if they are doing it in a systematic way or intending to overpopulate certain districts, underpopulate other districts, that is unconstitutional. The Voting Rights Act then would. Even though it just, say, takes you from 4 to 5 percent or from 7 to 8 percent? You're not crossing the 10 percent threshold. But as long as you're going up and you're doing it purposefully, in the sense of we have a policy to maintain county lines, that's impermissible. Yes, Justice Kagan. The position of the State is that when it's done in a systematic and intentional manner, when you create essentially barrios of burrows, excuse me, of certain folks, and then you overpopulate other districts, that violates this Court's one-person, one-vote principle. Scalia, just as a matter of curiosity, how do you end up being on this side of the case? You were defended in the district court, weren't you? The Secretary and the State thought the principle of one-person, one-vote and upholding that principle was very, very important, and that's why we felt compelled to be involved in this case. But only on appeal. You didn't argue this side in the district court, did you? That is correct, Justice Scalia. What happened? Was there an election in between or something? Yes, and I won overwhelmingly. I knew it. Thanks. Thank you very much. I will be up for re-election in three more years. So the anyway. Do you agree with your colleague that it doesn't make any difference that in the end result, the legislature, the Republicans were disproportionately advantaged, just had a disproportionate share of the seats? Yes, Justice. Our position is that that really is irrelevant as far as the numbers and ultimately whether the percentage of the public. So they would have ended up, if you're right, an even greater disproportion of the Republican representatives. And so ultimately, the number, this is not a line-drawing case, this is an overpopulation, underpopulation case. So how the lines are drawn and what the Republican or Democratic representation is in the State House or the State Senate is not important or not key to our argument. Our, the key to the State's argument is that this intentional and systematic one-way ratcheting of underpopulating minority ability to elect districts is what undermines the one-person, one-vote principle and what makes the actions of the IRC unconstitutional. Thank you, counsel. Thank you. Mr. Smith. Mr. Chief Justice, and may it please the Court, there is no basis for concluding that the minor, modest population variances among the districts in the Arizona map violate the Equal Protection Clause. That's because the fact findings, speaking of accepting fact findings, the fact findings, do you accept the fact finding that at least part of the motive was partisan? I don't think that's a fair characterization of what the district court found, Your Honor. Oh, really? Why? The district court found that the predominant motive for the population conditions Predominant motive. That's right. It said that there may have been two of the five commissioners who asked to one district, District 8, had some mixed motives in urging that that district be made more competitive, but did not find that the commission as a whole acted, even in that one instance, with partisan motivations. And that district is not one of the ones that's significantly underpopulated. The decision to move population around to make that district somewhat more competitive, even if it was motivated by partisanship, has nothing to do with what we're really talking about here, which is the 8.8 deviation. Well, I would be very upset if there was any motivation of partnership. I wish this case had come up before the case we had last term, which approved your commission, despite the text of the Constitution, because this commission was going to end partisanship, get politics out of redistricting. And here, the very next term, we have this case which asserts that there has been a lot of partisanship on the part of this supposedly divine commission. With respect, Your Honor, not a fair characterization of what happened and not a fair characterization of what the district court found after a full trial. What it found, after giving them a full opportunity to try to prove their claim that there was some invidious discrimination here, is that's simply not what happened. Instead, what happened is that they had these population deviations emerged in the final part of the process as they worked to make sure that their map would pass pre-clearance on the first try, something that the State of Arizona had failed to achieve in each of the three previous decades. Alito, the district court found, and this is on 79A of the appendix to the jurisdictional statement, partisanship played some role. So do you want us to interpret that to mean that if there was no partisanship, everything would have come out exactly the same way? It had no effect whatsoever on the districting. What the court said was, with respect to the changes to district 8, which, by the way, remained a largely Republican-leaning competitive district, that two of the parties were both thinking about aiding the pre-clearance arguments and also thinking about bringing the Democratic Party up closer to parity. It still didn't get to parity. And I think that to say that's a red herring. We don't need to discuss the issue of parity. If you have a system of proportional representation and you get 55 percent of the vote, you'll get 55 percent of the representatives. But in the kind of electoral system we have in the United States, with single-member districts and winner-take-all, a neutral districting plan will never produce exactly the same breakdown of legislators as the breakdown of the votes in the election. But that's, I mean, that's a side issue. What do we do with this statement, partisanship played some role? Your Honor, partisanship by itself cannot violate the Constitution. You have a, you have, even if you inflate that far beyond what was intended by the Supreme Court in that opinion, the case of Gaffney v. Cummings was a case where you had partisanship being the dominant controlling factor in every single line that was drawn. Alito, this is what, this is what interests me about the case. If we assume, as the district court did, that partisanship is not a legitimate consideration, it's not like respecting county lines, and if we interpret the district court's opinion as finding that partisanship was part of the reason for the plan that was adopted, then is the test, the Mount Healthy test, which in my understanding is what we normally apply in a constitutional mixed motive situation, so that if an illegitimate unconstitutional consideration is one of the reasons, the burden shifts to the defendant to show that things would have come out the same way even if that factor had not been in the case, or is it what the Court said in Bush v. Vera and a few other cases, that in this particular context, that's not the test. The test is whether the illegitimate factor there, race, was the predominant consideration. And that's, it seems to me, it turns on the choice between the two of them. Is that wrong? Accepting a lot of the premises of the question, which I think are counterfactual about the opinion and what was found here and all of that, it does seem to me that even if you're going to make partisanship something illegitimate in redistricting, which seems kind of like a fool's errand, frankly, it ought to at least have to be predominant. I mean, in a situation where you wouldn't want to say that the line drawers have to act with complete purity of heart, even when there's not. Kennedy, if there are some other factors that are also in play, that it's permissible to use an illegal standard in part, is that what you want us to write in this opinion? No, Your Honor. Nobody thinks that it's illegal to consider partisanship. Well, that's one of the issues in the case. We'll talk about that later, about partisanship. If you want to say it doesn't make any difference because partisanship is a valid consideration, fine, that's your point. But my question is, it sounds to me, in response to your answer to Justice Alito, that you're saying that it is all right to use an illegal standard in part to reduce equal representation. For all the same reasons that the Court has many times said we're not going to say any racial consciousness is enough to invalidate it, unless it predominates, I would think you'd want to follow the same approach, even if you were going to adopt the parity between racial considerations and partisan considerations, which makes no sense. Your entire Shaw v. Reno line of cases is about trying to decide whether it's race or party, and when you come to the conclusion easily that it's party, then it's okay. Can I put in my notes that you're arguing that partisanship is a valid consideration in redistricting? Is that what you want me to say? You certainly can, Your Honor. You said it last year in the Alabama case. You said political affiliation is one of the legitimate traditional redistricting criteria that line-drawers always can consider, that it's different.  Well, there's a problem. There is — I'm suddenly waking up here in the following sense. I mentioned your opinion, Your Honor. Look, look. How do you — how do we write this? There are two areas that are difficult to write. One is, I know there's this 10 percent rule, but it doesn't say we don't look at it at all. We institutionally can't review thousands of pages of record in every redistricting case. So what are the words there that describe the standard we should bring to this? And the second, which is a direct application of the first, is you're quite right. How can we say that partisanship can't be used at all when you're doing one-person, one-vote, but the sky is the limit, when in fact — of course, I dissented there, but the sky is the limit when you're drawing boundaries. Now, how do we reconcile — how do we reconcile our institutional ability with the need to have some policing here, and how do we reconcile what we say in this case with what we've held in the line-drawing area? Okay. Now, those are two questions in the back of my mind, and I'd like to have your position. Can I answer the second question first, Your Honor? Fifty words or less. It seems to me like it would be not defensible to adopt a rule that says partisanship in creating minor population deviations is actionable, absent some effect in terms of biasing the map, whereas in the line-drawing area, the Vieth situation, you have always insisted that there not only be a bias effect, but it be very large. I didn't ask you what we shouldn't say. I asked you what we should say. What you should say is — what you should apply is the rule that has been applied in all of these cases about minor population deviations. Is there a rational and legitimate policy that the State can articulate, which is the And here we have the Voting Rights Act is the rational and legitimate State policy. Well, let's talk about that for a second. If action in redistricting overpopulation would constitute illegitimate racial discrimination, can the answer that we're doing that to comply, to get preclearance from the Justice Department, legitimize that? Yes, Your Honor. This Court has said a number of times that complying with the Voting Rights Act is a compelling State interest. It assumed that just last year. My question is, if the action that is taken would otherwise constitute illegitimate racial discrimination, I'm trying to find out if the Justice Department's procedures can trump the requirements of the Constitution. In other words, it's an issue of — you know, we said in Ricci v. DeStefano that it's not an excuse, not a complete excuse, for intentional discrimination that you're trying to avoid liability under Title VII for discrimination on the basis of effects. And I'm wondering if it's somehow different. If the Justice Department is insisting on conduct that would constitute a violation, if they're insisting on more than they should be, is that a defense for the redistricting? Well, Your Honor, the one thing that is clear, Mr. Chief Justice, is that the Voting Rights Act does require people drawing lines to consider race. Section 5 required it to avoid retrogression. Section 2 requires it right now. I understand that, but it doesn't say that all bets are off. No, Your Honor. The line this Court has drawn is between maps which go too far and maps which don't, maps in which the racial considerations predominate and subordinate all other traditional districting principles here. And what you have in this case is the quintessential map where that's not true. It seems to me you're avoiding my question. What if the requirements that the Justice Department asks for, for preclearance, go too far? Well, I think if the Justice Department reads the Voting Rights Act in a manner that requires them to do something that would go too far in the predominant sense, that might be a constitutional problem. There's no indication here that that's what happens. Nobody else. So whether or not preclearance is a defense depends upon whether the Justice Department is insisting on too much. It could be, Your Honor, but there's no indication of anything like that here. This is a case where they simply said no retrogression. This is not like the 90s where they were saying you have to create new districts no matter how ugly to comply with. Breyer. Look at the finding to support what the Chief Justice is laying there. While partisanship played a role in the increased population deviation associated with changing District 8, so too did the preclearance goal play a role in motivating the change. It's the first half of the sentence which is raising the issue that I think people are trying to get you to say how we write that, you see, because it says it played a role. And so we're going to be asked here by the other side to expand on what that means play a role, and we have to write an opinion. And if you win this case, there will have to be words that support you. And so how do we take this thing? What would you say about the word play a role? I would say two things, Your Honor. First of all, it's a tiny role in this case. But second of all, even if it were the only reason why you had population deviations under 10 percent, I think it would be not defensible for this Court to say that by itself is unconstitutional. There is so de minimis effect on any interest in terms of representation from this difference of population, absent some bias in the way that the districts elect candidates, that it's simply not a constitutional problem that you ought to recognize where even if the pure motive was partisanship, it's simply not something that ought to be taken seriously as a constitutional problem. But here, where the predominant motive is to try to make sure these districts will pass preclearance, and less than 50 percent of the Commissioners may have had for one district where they increased the deviation slightly, like 0.2 percent, may have had some partisanship as well as the Voting Rights Act in mind for District 8. Not one of the 10 that were offered to the Justice Department as the ability to elect districts. That's a tiny, tiny, tiny sliver of partisanship for less than the full Commission. You would never call that. Alitoso, what if there were a case where the Commission or whoever was responsible for producing the plan produced, chose between two plans? Plan A has a deviation of 0.1 percent. Plan B has a deviation of 9.9 percent. And they write a report and they say, well, we came down to these two plans and we chose B because we want to maximize the representation in the legislature of Republicans or Democrats. And you would say that that would be constitutional? I think if that's the only thing that was problematic about the map, you might well say that's constitutional, but that's not this case, obviously. No, it's not this case, but it's not this case. And, you know, you've gone as far as Larios. You said a map that's an egregious gerrymander, massive disparate pairing of incumbents, plus the intentional abuse of the 10 percent rule at 9.98 percent. All of that together, you summarily affirmed a finding of unconstitutionality. But by itself, I don't know that I would even say that that's constitutional. Scalia. But that's because there's no constitutional criterion for where you draw the district lines. There is a constitutional criterion for how you weigh voters district by district. There is. One person, one vote. There's no such criterion for where the location of a district line has to be. But this Court has said over and over again, we want to give States leeway in this area because representation is often better if you give them some chance to make districts within the 10 percent band. And if you allow them to do what's being suggested here, to accuse, to bring partisanship in, and they can get to Federal court and they can get to trial just by that, then exactly what you said is going to happen in your dissent in Larios. Everybody with a political motivation to try to do something to undercut a map is going to come in. It's easy enough to allege partisanship. Here, the only evidence they have of partisanship, leaving aside the little story of District 8, is simply the pattern, that the Hispanic districts they underpopulated and the Native American district happened to vote Democratic. So you have this pattern, the chart on the 8.2 on 112A, but that's not evidence. It's equally consistent with what the Court found happened, which is they wanted to make these districts more persuasive as ability to elect districts so they could get preclearance. And, voila, they got preclearance. This is a case where you wonder, where's the beef? What exactly are we here for? There's no problem with this map. It's not a partisan gerrymander. It's not a racial gerrymander. It's within the 10 percent boundary. They did everything in open. Everything that's being complained about here, all of this underpopulation of these districts was done unanimously by all five Commissioners who adopted the goal of getting preclearance, who adopted the idea that they had to get 10 districts, not 8 districts, that every single change to those 10 districts that increased their underpopulation was unanimously voted by all five Commissioners. This is a case where there is simply nothing seriously being argued here that could possibly amount to a constitutional violation. And it seems to me that we can talk about whether a pure partisan case ought to, by itself, if the only problem is deviation, be unconstitutional. I would recommend that you not do that for the reasons that you said in your dissent at Larios, but, boy, this case is so far from that. I mean, the Republican Commissioners, appointed Commissioners, are voting for everything that they're complaining about because they, too, want to get preclearance. The State of Arizona wants very much to have its map go into effect for the first time since the 1960s when it became covered by the Voting Rights Act, rather than having a Federal court have to put the map into effect because preclearance was denied. And they hire lawyers who worked in the Justice Department, told them how many districts they needed, told them that if necessary in rejiggering these lines, they could go down up to the 10 percent limit. They then tried very hard to minimize that. And one of the things that's important to recognize here is you could have probably equalized the population here and still gotten districts to the same level of Hispanic population, but you would have had to draw tentacles of the kind that the Court has many times criticized. There's lots and lots of other Hispanic people in the State of Arizona who are not in these districts, but that's because they're spread out all over the place. And so if you're going to draw compact districts, if you're going to draw districts that respect county boundaries, if you're going to add census tracts and communities of interest, something has to give. And what gave here was this modest, tiny, small amount of population variation that seems to me just not a serious candidate for any kind of constitutional invalidation on the facts of this case, which aren't even challenged here is clearly erroneous. If the Court has no further questions, thank you. Roberts. Thank you, counsel. Ms. Harrington. Thank you, Mr. Chief Justice, and may it please the Court. The question in this case is not whether section 5 can compel deviations from a perfect population standard. The question is whether de minimis deviations are permitted by the Constitution. This Court has made very clear that when State districting plans are within a 10 percent deviation, total deviation, from a perfect population equality standard, those plans are presumed to be constitutional. Now, that presumption is a substantive rule that serves three important principles. Just if I can briefly tick them off, the first is that such de minimis deviations do not by themselves violate equal protection. The second is that giving States a 10 percent leeway actually enhances citizens' fair and equal representation by allowing States to pursue other important districting principles. And the third is that limiting Federal court intervention in de minimis deviation cases protects States' sovereign right to draw districts for their own legislative property. Roberts. Is 10 percent really de minimis? I mean, I think you can say it's minor, but de minimis strikes me as misleading when you're talking about 10 percent. Well, I certainly don't mean to be misleading, but that's the term that this Court has used. I know it has, yes. So I would never accuse the Court of being misleading. I mean, I think the point that the Court has made is that these sort of, you know, 10 percent deviations from perfect population equality don't have enough of a dilutive effect to really affect any citizen's right to fair and equal representation. Scalia. Does anybody contest that? I don't think that's contested here. I think the other side is willing to concede that it's presumptively okay, which means they have to come forward to show that there were invalid reasons why there is this discrepancy. That's true. And our view, Justice Scalia, is that the case should begin and end at the prima facie case requirement. Our view is that the plaintiffs did not make a prima facie case of invidious discrimination in this case, and so the district court's factual findings about the commission's actual motives actually aren't relevant at this point. I don't understand that. I thought a prima facie case means if you haven't made a prima facie case, you're out of court. Well, if you haven't made a prima facie case, it means that the State doesn't have to justify its reasons for the deviations. And so in this context, in order to make a prima facie case, what you have to do is put in enough evidence from which an inference of invidious discrimination can be made. What that generally requires is that the challenger has to put in enough evidence to rebut the presumed reasons for the challenged action. In this case, the Arizona Constitution sets forth the redistricting criteria that the commission is to use in drawing district lines. And so at a minimum, the plaintiffs should have come in and demonstrated that the deviations that they observed were not explainable as in service of those others. Alito, let's assume that the opinion of the district court found that partisanship was a consideration. So are you saying that that finding can't be sustained because it wasn't based on sufficient evidence brought forward by the plaintiffs? So first, just a point of clarification, the part of the opinion that you read was just talking about district 8. And so it wasn't a finding that partisanship played any role with respect to the rest of the map. And if you read on in the paragraph from which you're recording, the district court said that the amount of deviation that was attributable to the attempt to make the district more competitive was less than 1 percent. I think it was 0.7 percent. And so it's really a small, very small increase in deviation. Alito, was it a factor or not? Was partisanship just irrelevant? It played no role? Everything would have come out the same way without partisanship, according to the district court's findings. The district court found that with respect to one district, two of the five Commissioners were motivated in part by partisanship motives. But again, our first position is that this Court doesn't need to get to what the actual findings were as to the motive, because what the plaintiffs needed to do was come in and demonstrate at the front end that the lines on the map couldn't be explained as an effort to comply with legitimate districting criteria. Roberts What is the position of the United States on the question of whether it's permissible to intentionally take partisanship, to use partisanship as a guiding principle in redistricting? Is that permissible or not? We haven't taken a position on that. I know you haven't, and it seems very unfortunate. It's a little difficult for us to address it, since that's one of the main questions in the case. Harrington Well, the United States has never participated in the political gerrymandering cases. Certainly, you know, there are lessons that can be drawn from this Court's cases. In Gaffney, the Court indicated that certainly consideration of politics and partisanship does not necessarily make a plan unconstitutional. But again, in this case, I think in order to get to the question of what the State's actual motives were, there has to be some demonstration that the motives were not the announced motives that are in the Arizona Constitution. Roberts So you're unwilling to tell me whether intentional use of partisanship in redistricting is acceptable or not? Harrington Well, I think this Court's decision in Gaffney indicates that it can be permissible. The districting body in Gaffney was driven by a desire to equalize partisanship.  Breyer. I took it that the position of the United States is at least, since many commissions are nonpartisan because they have two people who are more partisan on one side, two people on the other side, and one neutral, so at the least where the commissioners don't account for a majority. The partisan motive is not held by a majority of the commission. Then it is constitutional for some members of the commission to take partisan considerations into account where they are not a majority and where the result is under 10 percent. Harrington I think that was the district court's conclusion. Our position is that the district court's conclusion is representing the United States. Well, again, we haven't taken a position on how one would analyze a partisanship if there was a finding that you get there about a partisan motive. Breyer. I read the finding as saying, well, two members of the commission out of five did have a partisan motive in part. So I have to, you have to, I think, have to say whether you think that is, that situation is constitutional or not. Harrington Well, let me make a pitch one more time for having a robust prima facie case. So what the plaintiffs needed to do was come into this, come into court and say, here's a map. It can't be explained by the criteria that are identified in the Constitution that the commission is supposed to go by. The very first criteria enlisted in the Constitution is compliant, includes compliance with the Voting Rights Act. If you look at the map and you look at which districts are underpopulated and which are the ability to elect districts, there is almost a perfect correlation. And I think that was a perfectly legitimate explanation for why there are deviations in the case. Scalia I don't understand this two out of five.  Because they were racists, the opinion would still be valid because, after all, five of us weren't. Would you even consider that? And why is it any different for a commission like this? The mere fact that two of them are, if partisanship is indeed bad. Harrington Well, again, I think, you know, we don't have a position on how one would analyze that question. Breyer Well, on that one, I think, one, this isn't racist. Number two, it's not this Court. Number three, I don't know any Court like that. And number four, if you're going to say, if you're going to say, if you're going to say that no members of a redistricting commission can ever have bipartisan views, I don't know where you're going to get your membership from. I mean, that is, that many of these commissions, I would think, would balance people who know about districting and who are also Republicans with people who know about it and are also Democrats, and then you have someone of undoubted neutral neutral. Scalia Which is not the case here. That places a lot of weight on selecting the fifth person who is lily, lily-white pure, right? And if that person, deep down, is partisanship one side or the other, the whole thing goes. And that is the allegation here, by the way. Harrington I'm sorry to interrupt. This Court has repeatedly said that politics is always going to be part of redistricting. And so I think it's, you can't, you can't say that in a Scalia I agree with that, and that's a different point. I mean, you don't have a position on whether that's acceptable or not. It's a difference between saying something's a necessary evil and saying it's evil. Harrington Well, I think this Court's decisions have told us that it's fine to have partisanship play some role in redistricting. That's the lesson of Gaffney. Alito Well, I'm really surprised at the way you read the district court's opinion. In footnote 10 of the district court's opinion, they set out the standard that they apply. Harrington Can you give me the page, please? Alito It's on 62, I'm sorry, 63a, running over into 64a. And in the final paragraph that begins at the bottom of the page, For decision purposes, a majority of the panel made up of Judge Clifton and Judge Silver have concluded that plaintiffs have not demonstrated that partisanship predominated over legitimate redistricting considerations. Doesn't that mean that they found that there were some illegitimate considerations? Or at least they assumed that partisanship was an illegitimate consideration. Harrington Based on page 79a, which is where you were reading from earlier, I think it's clear that what they're talking about, that partisanship played a role only with respect to district 8. But let me just say, if this Court allows a plaintiff to come in and just point to deviations of district 8. Alito I'm sorry, just to clarify your answer. So you think that what they said in footnote 10 only applies to one district? Harrington Yes, that's my reading of the opinion. I think I haven't heard the other side disagree with that, but you can ask them. You know, if this Court makes it too easy for plaintiffs to come in and point to deviations and partisan correlation, then it's going to totally wipe away the 10 percent leeway, which itself serves important districting principles. Roberts Thank you, Ms. Harrington. General Hearn, you have 4 minutes remaining. Thank you, Mr. Chief Justice. Scalia What about footnote 10? Do you agree with the characterization that the other side has made? Harrington Well, footnote 10, no, I do not. And the portion I would quote was not limited just to district 8. Partisanship was rank in this redistricting process, and it's demonstrated objectively, not just with Judge Wake's chart, but it's also demonstrated by the fact of district 8, which was not submitted for preclearance. Scalia I want a finding. I want a finding. I don't want to look at a chart and have to make my own factual determination. What factual finding other than footnote 10 is there? Harrington Then I would quote from the appendix at 107A, which is where the statement's made, ''Judge Clifton correctly finds that the IRC was actually motivated by both partisan advantage and hope for voting rights preclearance, so we have a majority for that finding of fact.'' So that is two members of the Court specifically found that partisanship was one of the two motives to explain these deviations from one person, one vote. So clearly it was a motive. At that point, as even Judge Silver noted, this is a mixed motive. Scalia But to what extent? I mean, the other side is going to say, yeah, that's true, but it's only true as to that one district discussed in footnote 10. Well, if that's so, then they would have stopped and adopted the initial map and not continue to deviate from 4 percent to 8 percent for the final map. The initial map, the draft map, was a 4 percent deviation. Dr. King, their own expert, said that this map complied with the Voting Rights Act, and yet they went after that and continued deviating and underpopulating districts to get to the 8.8 percent. That included the machinations with District 8. So if the only legitimate reason was to obtain preclearance, then they would have accepted the draft map and it would have been game over. But they didn't. They went ahead and conducted these further deviations. Kagan I thought it was because they wanted to make super sure that they complied with the Voting Act. I think that that's why they said they kept going. The explanation that was made is that they are, quote, ''strengthening'' to underpopulate districts because their consultant said, ''Oh, that does help us get Voting Rights Act preclearance approval.'' That was the explanation made. But if their own expert said the original map, the draft map, satisfied the Voting Rights Act, and the only reason to additionally depopulate these districts was to achieve a further partisan skew, which Judge Wake's chart demonstrates, then that shows that partisanship was a very, I understand two of the members said that it was not the primary motive, but it certainly was a pervasive motive in the process by which these districts were drawn. And our position is a very narrow one that we ask the Court to hold, is that partisanship does not justify deviating from one person, one vote, and that a mistaken belief that preclearance was necessary to underpopulate certain districts also does not justify deviating from one person, one vote. Roberts Where is the district in which, or the State, in which partisanship does not play a role in redistricting? Well, we think partisanship is always going to play a role. We would say, but there's an outer limit, a certainly, as Justice Scalia noted, a articulatable, justiciable standard of one person, one vote. That's a rule that we can cabin the partisanship. You can be partisan, and we don't fault the commission for having partisan interests, Republican members, Democrat members, even if this fifth member ended up being partisan interest for the Democrats, that's fine. The problem here isn't that they had partisan motives, it's that they deviated from the one person, one vote principle to further those partisan motives. And that's what we do. Kagan If I could ask the question that Ms. Harrington left with, was that – I'm sorry. Roberts No, please, finish. Kagan If you're saying that even within the 10 percent, you know, to go from 1 percent to 2 percent, or from 2 percent to 3 percent, and then somebody can come in and say that's partisanship, it means that every single plan will be up for grabs in every single place, doesn't it? Roberts I don't think it does. And the answer would be it doesn't, because in this case there were no other legitimate reasons to explain it. If that is the reason and the only reason to deviate – only other legitimate reason to deviate from one person, one vote, then it is not a constitutional plan. But that's not present in all the other cases. Roberts Thank you, counsel. The case is submitted.